UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

JULES GAUTIER,
*individually and on behalf of all
others similarly situated*,

      Plaintiffs,

v.   CIVIL ACTION NO. 5:20-cv-00165

TAMS MANAGEMENT, INC,
PAY CAR MININC, INC.,
BLUESTONE INDUSTRIES, INC.,
BLUESTONE RESOURCES, INC.,
BLUESTONE COAL CORP.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Pending are cross motions for summary judgment as to Tams Management, Inc., Pay Car Mining, Inc., Bluestone Industries, Inc., Bluestone Resources, Inc., and Bluestone Coal Corp. (collectively, the "Defendants") and Plaintiff Jules Gautier. [Docs. 88, 90].[1] The parties timely filed their responses and replies. The matter is ready for adjudication.

I.

Mr. Gautier, Plaintiff and class representative, worked at the Burke Mountain Mine Complex from March to October 2019. The Complex is owned and operated by Defendants. [Doc. 39-1]. On October 24, 2019, Mr. Gautier was laid off with approximately 90 other full-time

---

[1] Also pending is Plaintiff's Motion for Leave to File Supplemental Authority, filed August 4, 2022. [Doc. 116]. The Motion is **GRANTED**.

employees without prior written notice. [Doc. 39-2]. On or about April 22, 2020, Patrick Graham, Tams Management, Inc.'s Vice President of Safety and Human Resources, called Mr. Gautier and other class members and offered them reemployment. [Doc. 39-1]. Mr. Gautier declined. [Doc. 11 ¶ 6]. The employees who accepted the offer returned to work on April 23, 2020, 5 months and 30 days after the discharge. [*Id*. ¶ 8].

Mr. Gautier instituted this action on March 4, 2020. [Doc. 1]. He pleads on behalf of himself and a class of workers harmed by an alleged Worker Adjustment and Retraining Notification ("WARN") Act violation. [*Id*. ¶ 33]. Specifically, he alleges Defendants Tams Management, Inc. and Pay Car Mining, Inc., "on their own and in concert with their affiliates Bluestone Industries, Inc., Bluestone Resources, Inc., and Bluestone Coal Corp." violated the WARN Act. [*Id*. at 1]. He alleges on October 24, 2019, Defendants "failed to provide their full-time employees with sixty-days['] notice" prior to laying off more than 50 workers at the Burke Mountain Mine Complex, [*id*. at 1], which he asserts is a "single site of employment" under the WARN Act, [*id*. ¶ 15].

Both parties seek summary judgment. [Docs. 88, 90]. Mr. Gautier alleges he suffered an "employment loss" from an indefinite termination, a reduction in hours of work of more than 50%, or both. [Doc. 91]. Defendants maintain the reduction in hours claim should be excluded inasmuch as it was alleged only through motion practice. [Doc. 89]. In addition, they contend there was a "layoff," not a "reduction in hours" or "termination," and that the layoff did not exceed six months. Thus in their view, there was no "employment loss" under the Act. [*Id*.].

II.

A.  ***Summary Judgment***

*Federal Rule of Civil Procedure* 56 provides that summary judgment is proper

where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 (1986). "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks and citation omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 221 (4th Cir. 2022).

**B.** **The WARN Act**

The WARN Act, enacted in 1988, requires an employer to provide 60-days' notice before ordering a "plant closing" or "mass layoff." 29 U.S.C. § 2102(a). "An employer who fails to provide this notice is liable to each affected employee for backpay, benefits, and attorney's fees." *Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 808 (4th Cir. 2007) (citing 29 U.S.C. § 2104(a)). To succeed on a claim under the WARN Act, plaintiffs must show (1) there was a "mass layoff" or "plant closing" as defined by the Act; (2) the layoff was conducted by an "employer" covered by the Act; and (3) the employer terminated employees who were covered by the Act and thus who were entitled to notice. *McKenzie v. CDA, Inc.*, 3:19-cv-213, 2021 WL 1220620, at *8 (W.D.N.C. Mar. 31, 2021).

A "mass layoff" is a "reduction in force . . . not the result of a plant closing[, which] results in an employment loss at the single site of employment during any 30-day period for . . . at least 33 percent of the employees . . . and . . . at least 50 employees." 29 U.S.C. § 2101(a)(3). A "plant closing" is

> [t]he permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees.

29 U.S.C. § 2101(a)(2).

The WARN Act defines "employer" as "any business enterprise that employs . . . 100 or more employees, excluding part-time employees." *Schmidt v. FCI Enters. LLC*, 3 F.4th 95, 101 (4th Cir. 2021) (citing 29 U.S.C. § 2101(a)(1)(A)). An affected employee who is entitled to notice under the Act is an employee "who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." 29 U.S.C. § 2101(a)(5). The applicable Department of Labor regulations define an "employment loss" as "(i) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (ii) a layoff exceeding 6 months, or (iii) a reduction in hours of work of individual employees of more than 50% during each month of any 6–month period." 20 C.F.R. § 639.3(f).

### III.

**A.**     ***WARN Act Standing***

Defendants incorporated into their Motion for Summary Judgment their assertion Plaintiff does not have standing to bring a WARN Act claim.[2] This assertion reduces to a couple

---

[2] Regarding the parties' references to the Court's suggestion at an earlier point in the case that Defendants constitute a single employer and the Burke Mountain Mine Complex is a single site of employment, [Doc. 89 at 2, n.2], there appears to be a misconception that the matters

of main issues. First is whether the Defendants are a "single employer" under the Act. This is a crucial inquiry not only to establish if all defendants are liable but also because it is unclear in the record whether Tams Management, Mr. Gautier's direct employer, meets the definition of "employer" under the Act. Second, because the Act specifies the employment loss must have occurred at a "single site of employment," Mr. Gautier must establish the Burke Mountain Mine Complex comprises such a "single site."

### 1. *Single Employer*

The first issue is whether Defendants constitute a "single employer." Defendants maintain they are not a single employer and Mr. Gautier was employed only by Tams Management. [Doc. 47 at 5]. They assert the number of Tams Management employees who were affected does not meet the 50-employee threshold established by the WARN Act. [Doc. 47 at 5]. They further contend Tams Management did not employ 100 individuals and is not, standing alone, an "employer" as defined by the Act. [*Id.*].

Determining whether a business is an "employer" under the Act is a mixed question of law and fact. *Schmidt*, 3 F.4th at 101. The WARN Act's regulations provide that "[u]nder existing legal rules, independent contractors and subsidiaries which are wholly or partially owned

---

have been finally adjudicated. The Court's suggestion earlier in the litigation was a prima facie determination for purposes of certifying the class. [Doc. 59 at 8]; *see also Piron v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19CV709, 2022 WL 363958, at *13 (E.D. Va. Feb. 7, 2022) ("Granting class certification will still allow the parties to dispute whether Plaintiffs can meet the 'single site of employment' requirement . . . particularly because 'the Fourth Circuit has not provided specific guidance regarding which standard a district court should use to evaluate single employer status under the WARN Act.' *Butler v. Fluor Corp.*, 511 F. Supp. 3d 688, 698 (D.S.C. 2021). Accordingly, the contention that Plaintiffs cannot prove a WARN Act claim due to lack of a 'single site of employment' 'is properly addressed at trial or in a ruling on a summary judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class.' [*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 470 (2013)].")

by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent." 20 C.F.R. § 639.3(a)(ii)(2) (1989); *see also Butler v. Fluor Corp.*, 511 F. Supp. 3d 688, 697 (D.S.C. 2021), *aff'd sub nom. Pennington v. Fluor Corp.*, 19 F.4th 589 (4th Cir. 2021).

When considering whether related entities are a "single employer," courts should consider the following non-exclusive factors: (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations. 20 C.F.R. § 639.3(a)(2). "The [Department of Labor] factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind." *Pennington*, 19 F.4th at 597 (quoting *Pearson v. Component Tech Corp.*, 247 F.3d 471, 489 (3d Cir. 2001)). "[I]n some instances distinct businesses may count as the same employer for the purposes of the WARN Act. This would be the case where the operational differences between the two companies are purely formal, so that for all intents and purposes the businesses really do operate as the same employer." *Pennington*, 19 F.4th at 596 (citing *Pearson*, 247 F.3d at 495 (noting that the proper inquiry is "into whether the two nominally separate entities operated at arm's length")).

Independent contractors may also be treated as part of the contracting company for present purposes. 20 C.F.R. § 639.3(a)(2). The factors enumerated in determining whether parent/subsidiary companies are an "integrated enterprise" also determine whether an independent contractor and the contracting company are an "integrated enterprise." 20 C.F.R. § 639.3(a)(2); *see also McKinney v. Carlton Manor Nursing & Rehabilitation Ctr., Inc.* 868 F3d 461, 464 (6th Cir. 2017). Again, the critical factor is the degree of independence. *See* 20 C.F.R. § 639.3(a)(2).

The common ownership factor "inquires as to whether a parent or related entity

directly owns a separate corporate entity." *Butler*, 511 F. Supp. 3d at 700. The common directors or officers factor

> ordinarily looks to whether the two nominally separate corporations: (1) actually have the same people occupying officer or director positions with both companies; (2) repeatedly transfer management-level personnel between the companies; or (3) have officers and directors of one company occupying some sort of formal management position with respect to the second company.

*Butler*, 511 F. Supp. 3d at 700 (citing *Pearson*, 247 F.3d at 497).

"De facto exercise of control applies where one company is 'the decisionmaker responsible for the employment practice giving rise to the litigation.'" *Pennington*, 19 F.4th at 598 (quoting *Pearson*, 247 F.3d at 503–04). "The factor thus incorporates a longstanding theory of affiliate liability that holds parents accountable where they are directly liable for the actions of a subsidiary." *Id.* De facto control in the context of a relationship between a principal and its contractor also considers "whether the business in question has specifically directed the allegedly illegal employment practice that forms the basis for the litigation." *Butler*, 511 F. Supp. 3d at 700–01 (citing *Administaff Cos. v. N.Y. Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 457–58 (5th Cir. 2003)).

The unity of personnel policies factor "is analogous to the aspect in the federal labor law test concerning 'centralized control of labor operations,'" and includes such elements as "centralized hiring and firing, payment of wages, maintenance of personnel records, benefits and participation in collective bargaining." *Vogt v. Greenmarine Holdings*, 318 F. Supp. 2d 136, 142–43 (S.D.N.Y. 2004). In essence, this factor examines "whether the companies actually functioned as a single entity with regard to its relationship with employees." *Pearson*, 247 F.3d at 499.

"In some cases, the dependency of operations factor 'addresses three areas of overlap between related corporations: (1) sharing of administrative or purchasing services,

7

(2) interchanges of employees or equipment, or (3) commingled finances.'" *Butler*, 511 F. Supp. 3d at 710 (quoting *Guippone v. BH S & B Holdings*, No. 09 Civ. 1029, 2010 WL 2077189, at *6 (S.D.N.Y. May 18, 2010)). "But in other cases, courts look beyond an individual job site to see if two entities are otherwise dependent on their continued operations." *Id.* (citing *Martin-Smith v. Ramcor Servs. Grp.*, No. 2:10–CV–00403, 2012 WL 4472036, at *6 (D. Nev. Sept. 25, 2012)) (observing two companies were not codependent because their respective operations went "well beyond" the contract at issue, and outside of that contract, the companies had no relationship, "much less a dependency relationship")).

The Defendants alleged status as a "single employer" is a material factual issue. As noted above, this status is required if all Defendants are to be liable for the alleged WARN Act violation, as well as to show that the minimum numbers required by the "employer" and "mass layoff" definitions are met. [Doc. 46 at 6, Doc. 47 at 7].

Further, whether Defendants constituted a single employer is disputed. As to the common ownership factor, Plaintiff maintains all the named Defendants are related entities. [Doc. 46]. The Declaration of Stephan Ball, Vice President for Bluestone Resources, Inc., certifies that 60% of Bluestone Resources is owned by James C. Justice, II, and the remaining 40% is owned by James C. Justice, III. [Doc. 47-1 ¶ 6]. Further, Bluestone Industries, Inc., is a wholly-owned subsidiary of Bluestone Resources. [*Id.* ¶ 7]. Bluestone Coal Corporation is a wholly-owned subsidiary of Bluestone Resources. [*Id.* ¶ 8]. Pay Car Mining, Inc. is a wholly-owned subsidiary of JCJ Coal Group, LLC, which is a wholly-owned subsidiary of Bluestone Resources. [*Id.* ¶ 9]. While Tams Management is not legally tied to Bluestone Resources, it is owned directly by James C. Justice, III and Jillean L. Justice. [*Id.* ¶ 10]. The record is such that a reasonable jury could find this factor weighs in favor of either parties' position.

Considering next the factor of whether the entities had common directors and/or officers, again there are genuine issues of fact to be resolved. Plaintiff asserts many of the supervisors and managers at the Burke Mountain Complex were on the payroll of Bluestone Industries. [Doc. 46 at 9]. Further, he states two of these supervisors are the ones who told him not to return to work. [*Id.*]. Mr. Gautier notes further occurrences where individual directors for Bluestone Industries exercised authority to idle other mines and operations at the Burke Mountain Complex. [*Id.*]. Defendants summarily deny that these facts indicate they operated as a single employer. [Doc. 47 at 6–7]. Accordingly, based on further development of these facts at trial, this factor could weigh in favor of either party.

As to the de facto exercise of control, Mr. Gautier conclusorily notes, in a footnote, that "Bluestone Industries has customarily exercised central control over the employment determinations regarding coal production, coal sales, maintenance, and the mine planning processes at the Burke Mountain Mine Complex, specifically including the determination to idle the operations and/or to conduct a reduction in force." [Doc. 46 at 10, n.4]. There appears to have been no record developed -- or at least not presented to the Court -- respecting whether Bluestone Industries was involved in the decision to idle the Burke Mountain Complex on this occasion. Defendants again deny they were a single employer and that they exercised control over the complex, stating Tams Management was hired to run the operation. [Doc. 47 at 6]. But again, they do not point to facts in the record that would support that assertion or that would prevent a finding of single employer status based on an independent contractor theory.

Much the same could be said regarding the factors of unity of personnel policies emanating from a common source and the dependency of operations. Plaintiff again offers conclusory statements, citing to the limited record. Defendants dispute the admissibility and utility

9

of the supporting record but do not offer facts that tend to show otherwise. Accordingly, there is an insufficient basis for the Court to grant either party summary judgment on the issue.

Inasmuch as balancing the factors to determine whether Defendants operated as a single employer requires careful consideration of the facts -- and requires a more fully developed record -- the evidence on this issue must be presented to the jury.

### 2. Single Site of Employment

Defendants likewise maintain the Burke Mountain Mine Complex was not a single site of employment. [Doc. 46 at 10]. The WARN Act does not, itself, define what constitutes a "single site of employment" for the purposes of its provisions. However, "'the Secretary of Labor, pursuant to her authority, has promulgated interpretive regulations,' 20 C.F.R. § 639.3(i), that are 'entitled to "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."'" *Meson*, 507 F.3d at 808–09 (quoting *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 844 (1984)). These regulations provide that a "single site of employment" may refer to a "single location" or a "group of contiguous locations." 20 C.F.R. § 639.3(i)(1).

In general, "separate facilities are separate sites." *Davis v. Signal Int'l Tex. GP*, 728 F.3d 482, 485 (5th Cir. 2013). "Separate buildings or areas which are not directly connected or in immediate proximity" may, however, constitute a single site of employment, "if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment." 20 C.F.R. § 639.3(i)(3). On the other hand, "[n]on-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site." *Id.* § 639.3(i)(4).

Again, inasmuch as establishing that the alleged employment loss occurred at a "single site of employment" is required by the Act, 29 U.S.C. § 2101(a), it presents a material

factual issue. For many of the same reasons discussed above, it is also disputed. Plaintiff maintains the complex was operated under a "unified management team employed by Bluestone Industries." [Doc. 46 at 5]. He further alleges "the mines used a commingled workforce in which hourly miners were routinely exchanged between the working areas. [*Id.*]. Plaintiff also cites to the close geographic nature of the job sites and the sharing of equipment and facilities. [*Id.* at 11].

Specifically, Mr. Gautier cites to three pieces of the complex, Mine No. 57, Job 39, and the K2 plant, which he states, "were located within close geographic proximity to one another via permitted coal mining operations under the control of the Defendants, pursuing a common operational purpose, and sharing crews, equipment, and facilities." [*Id.*]. He also maintains that "the coal-mining permits at the Burke Mountain site are all coterminous and otherwise directly connected by the same haulage roadways that are permitted in the name of the same Defendants, and connected to the Defendants' coal preparation facilities." [*Id.*].

On the other hand, Defendants maintain that the record only shows that "coal produced at Plaintiff's mine (Mine 39A) was processed at the K2 preparation plant, and that slurry produced at Plaintiff's mine in 2019 was processed at the K-2 slurry cells/refuse site." [Doc. 47 at 6]. Thus, this issue is likewise preserved for presentation to the fact finder at trial.

**B.** *Employment Loss*

There remains, as well, the extant factual question of whether the employment action here was an "employment loss" under the Act. Mr. Gautier maintains he "suffered an 'employment loss' under the WARN Act because he experienced either an indefinite termination of employment and/or a reduction in hours of work of more than fifty percent during each month of the 6-month period following October 24, 2019." [Doc. 91 at 1]. Defendants, however, contend the severance from employment constituted neither a termination nor a reduction in force, but

rather a layoff which did not exceed six months. They further maintain the reduction in hours theory was not properly pled. [Doc. 89 at 4].

"Not every negative turn in employment circumstances constitutes an 'employment loss' for purposes of the WARN Act." *Graphic Commc'ns Int'l Union, Loc. 31-N v. Quebecor Printing (USA) Corp.*, 252 F.3d 296, 299 (4th Cir. 2001). "Employment loss" means (A) an employment termination other than discharge for cause, voluntary departure, or retirement; (B) a layoff exceeding six months; or (C) more than 50% reduction in work hours during each month of any six-month period. *Id*. (citing 29 U.S.C. § 2101(a)(6)).

The distinction between a layoff or termination for the purposes of defining "employment loss," is that "the term 'termination' means the permanent cessation of the employment relationship and the term 'layoff' means the temporary cessation of that relationship." *Long v. Dunlop Sport Grp. Ams.*, 506 F.3d 299, 302 (4th Cir. 2007).

This determination requires an initial categorization of the dismissal imposed on the employee. *Leeper v. Hamilton Cnty. Coal, LLC*, 939 F.3d 866, 870 (7th Cir. 2019), *cert. denied* 140 S. Ct. 2568 (2020). As the United States Court of Appeals for the Seventh Circuit stated in *Leeper*, this threshold question is most reasonably considered with an objective analysis of the circumstances, not a "hindsight-informed count of how many employees returned within a six-month period." *Leeper*, 939 F.3d at 870. *But see Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1282 (8th Cir. 1996) ("A common sense reading of the [WARN Act] indicates it is the actuality of a termination which controls and not the expectations of the employees.").

Employees have a "reasonable expectation of recall" when they understand, through notification or industry practice, that their employment has been temporarily interrupted and that they will be recalled to the same or a similar job. 20 C.F.R. § 639.3(a)(1); *see also Bledsoe*

*v. Emery Worldwide Airlines, Inc.* 635 F.3d 836, 848 (6th Cir. 2011). Relevant factors in determining the "reasonableness" of the employees' expectations include (1) past experience of the employer; (2) employer's future plans; (3) circumstances of the layoff or absence; (4) expected length of layoff or absence; and (5) industry practice. *Bledsoe*, 635 F.3d at 848.

As a preliminary matter, Defendants assert Mr. Gautier cannot proceed on the reduction in hours theory because it was not set forth in the Complaint. [Doc. 89 at 4]. Mr. Gautier responds "this Court already concluded the eleventh-hour offer of employment did not preclude the Plaintiff from asserting he experienced a reduction in hours of over fifty percent in each of the six months following his severance of employment." [Doc. 91 at 10]. As noted in the margin, the purported "finding" was instead a recognition there was a prima facie showing on the point for the limited purpose of certifying the class. Importantly, as Defendants note in their Response, that "finding" suggested such a claim could be actionable. [Doc. 94 at 2–3]. Defendants are likewise correct Mr. Gautier has only "pled" the work-reduction basis in motion practice, not the operative pleading. [Doc. 94 at 2]. The operative pleading alleges only that the class suffered an employment loss from a plant closing or mass layoff. [*See, e.g.*, Doc. 1 ¶ 30]. The reduction of hours assertion appears nowhere therein. [Doc. 1].

At the same time, Defendants have been aware of this theory of Plaintiff's case throughout the discovery period. There is thus no surprise, much less prejudice. Additionally, the July 27, 2022 integrated pretrial order, which is not a model of clarity from either side, fairly raises the theory. That makes a pleading amendment unnecessary. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007) ("Here, we have not only an amended complaint, but a final pretrial order that superseded all prior pleadings and 'controll[ed] the subsequent course of the action,' Fed. Rule Civ. Proc. 16([d])."); *Curtis v. Loether*, 415 U.S. 189, 190, n.1 (1974) (Where a claim

13

was not included in the complaint, but was included in the pretrial order, "it is irrelevant that the pleadings were never formally amended." (citing Fed. R. Civ. P. 15(b), 16[d])).

Turning to the substance of the issue, Mr. Gautier testified that he was told orally about his discharge, and "the record indicates that the cessation of employment was for an indefinite period of time." [Doc. 91 at 13]. Further, the "testimony of numerous class members indicates they may well have had a reasonable expectation of permanent cessation of employment, *i.e.*, (1) the mine shut down, (2) they were unemployed, (3) they felt that they had to (and did) relocate their families, and (4) they understood that they were 'terminated." [Doc. 91 at 13]. Defendants contend Mr. Gautier and other members of the class were aware this was a temporary layoff and they may be recalled. [Doc. 89 at 7]. Defendants, in support of their position, point to the testimony of several class members, a call-back sheet that was circulated the last day of operations, and the fact that Mr. Gautier was ultimately called back to work. [*Id.*]. This sharp factual dispute in the evidentiary record is thus also reserved to the fact finder at trial.

Furthermore, Plaintiff is not precluded by law from arguing in the alternative that the employment loss here was a reduction in hours under § 2101(a)(6)(C). Defendants maintain that such a construction of subsection (C) would conflate the layoff and reduction in force provisions of the statute, making them superfluous. However, the Court need not turn to such a canon of construction when the text of the statute is clear, as it is here. *United States v. Graham*, 608 F.3d 164, 176 (4th Cir. 2010) ("[P]roper statutory construction 'begins with the language of the statute,' and when, as here, 'the statutory language provides a clear answer, it ends there as well.' *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).") If Mr. Gautier was not scheduled to work from October 24, 2019, until April 23, 2020, that may indeed ultimately coincide with the plain meaning of a reduction in hours by 50% over a 6-month period.

14

## IV.

For the foregoing reasons, the Court **DENIES** both Plaintiff's Motion for Summary Judgment [**Doc. 90**] and Defendants' Motion for Summary Judgment [**Doc. 88**].

Given that both parties demanded a trial by jury on all issues in their pleadings, the Court will submit the issue of damages to the jury, along with liability. The Court will treat any damages finding, in the alternative, as an advisory verdict under *Federal Rule of Civil Procedure* 39. Fed. R. Civ. P. 39(c)(1) ("In an action not triable of right by a jury, the court, on motion or on its own may try any issue with an advisory jury."); *see also Creech v. Va. Fuel Corp.*, 61 F. Supp. 3d 592, 593–94 (W.D. Va. 2014) ("Few courts have decided whether there is a right to jury trial under the WARN Act, and the Fourth Circuit has not yet decided the issue. The weight of existing authority—including the Sixth Circuit court of appeals, the only circuit court to have squarely addressed the issue—holds that there is no right to jury trial because the Act's remedies are equitable in nature.").

The Clerk is directed to send a copy of this written opinion and order to counsel of record and any unrepresented parties.

ENTER: August 8, 2022

Frank W. Volk
United States District Judge